IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
5:21-CV-173-D

TRACIE BEARD, )
individually and on behalf of )
all others similarly situated, )
)
               Plaintiff, )
)
v. ) **ORDER**
)
JOHN HIESTER CHEVROLET, LLC, )
)
               Defendant. )

On April 14, 2021, Tracie Beard ("plaintiff" or "Beard") filed a putative class action under the Telephone Consumer Protection Act, 47 U.S.C. §§ 227, et seq. ("TCPA") against John Hiester Chevrolet, LLC ("defendant" or "JH Chevrolet") [D.E. 1]. On May 12, 2021, Beard amended her complaint [D.E. 7]. On March 30, 2022, JH Chevrolet moved for summary judgment [D.E. 32] and filed a memorandum in support [D.E. 33], statement of material facts [D.E. 34], and appendix [D.E. 35]. On April 4, 2022, Beard moved to defer ruling on JH Chevrolet's motion for summary judgment [D.E. 39]. On April 20, 2022, Beard responded in opposition to JH Chevrolet's motion for summary judgment [D.E. 43] and filed a response to JH Chevrolet's statement of material facts [D.E. 44]. On May 24, 2022, JH Chevrolet responded to Beard's motion to defer ruling on the motion for summary judgment [D.E. 52]. On June 14, 2022, the court granted in part and denied in part Beard's motion to defer ruling on JH Chevrolet's motion for summary judgment [D.E. 55]. On July 1, 2022, Beard responded in opposition to JH Chevrolet's motion for summary judgment [D.E. 59] and filed a response to JH Chevrolet's statement of material facts [D.E. 60] and appendix [D.E.

61]. On July 15, 2022, JH Chevrolet replied [D.E. 62]. As explained below, the court grants JH Chevrolet's motion for summary judgment.

I.

When Beard was considering buying a vehicle from JH Chevrolet, she provided information online and via telephone to JH Chevrolet and WeBuy, a website that provided information to JH Chevrolet. See [D.E. 60] ¶¶ 2, 5–6. At the time, Beard had two cell phone numbers: (1) 919-288-6590 ("6590") and (2) 919-288-0677 ("0677"). Id. at ¶ 1; [D.E. 33-1] 18, 20. On September 30, 2020, Beard used the 6590 phone to call JH Chevrolet and ask about a vehicle. See [D.E. 60] ¶ 2. That same day, Beard made an online inquiry to JH Chevrolet's website, and supplied her name, email address, 6590 phone number, and other personal information. Id. at ¶¶ 5–6; See [D.E. 33-1] 53. After providing her information on the webpage online, Beard clicked to the next screen of the webpage. See [D.E. 33-1] 54. The next screen required Beard to click a box next to both "I am not a minor" and "I agree to Terms of Service, Privacy Policy, and Privacy Notice" to continue to the next page in the process. See id. The words "Terms of Service," "Privacy Policy," and "Privacy Notice" appeared in a light red color to indicate hyperlinking, and the other words in the statement appeared in black. See id. The acceptance statement appeared in the same size and style font as the prompts used to direct a user to enter her name, email address, and password. See id. Before an individual could proceed to the next page, she had to check the box. See [D.E. 33-1] 54–55. The hyperlinked agreements contained passages notifying Beard that her information could be used "for our marketing purposes" and "for our affiliates to market to you." See [D.E. 35] 74–75. Beard does not recall whether she actually clicked on the "I agree to" box on WeBuy's website. Compare [D.E. 33] 7–11 and [D.E. 33-1] 53–55 and [D.E. 62] 3–5 with [D.E. 60] ¶¶ 7–13, 15. Nonetheless, JH Chevrolet's exhibits and the fact that Beard could not have proceeded in the process without clicking

2

the "I agree to" box and proceeding to the next page demonstrate that Beard clicked the "I agree to" box on September 30, 2020. Compare [D.E. 33] 7–11 and [D.E. 33-1] 53–55 and [D.E. 62] 3–5 with [D.E. 60] ¶¶ 7–13, 15.

On October 28, 2020, November 24, 2020, and December 22, 2020, Beard received prerecorded telemarketing voicemails to her 6590 number. See [D.E. 60] ¶¶ 17, 19, 23; Am. Compl. [D.E. 7] ¶ 22; [D.E. 33] 7. The parties dispute whether these prerecorded voicemails came from calls or ringless voicemails. See [D.E. 60] ¶¶ 28–29. On November 18, 2020, Beard called JH Chevrolet using her 0677 number and left a voicemail. See id. ¶ 20. In the voicemail, Beard stated, "My number is (919) 288-0677. Do not call this number. I'm not interested in a car. I have not done business with y'all. I work a full-time job. My number is (919) 288-65 -- 0766." Id. at ¶ 21. Following this voicemail, JH Chevrolet did not contact the 0677 number. Id. at ¶ 22.

On April 14, 2021, Beard filed a putative class action under the TCPA against JH Chevrolet alleging that the prerecorded voicemails caused injuries, including, "invasion of privacy, aggravation, annoyance, intrusion on seclusion, trespass, and conversion," because the prerecorded voicemails made Beard "stop what she was doing and listen to the pre-recorded messages" and "occupied [her] telephone lines and rendered the devices unavailable for the receipt of other calls." Am. Compl. ¶¶ 22–27. On March 30, 2022, JH Chevrolet moved for summary judgment. See [D.E. 32]. In its motion for summary judgment, JH Chevrolet argues that ringless voicemails are not calls under the TCPA, the intangible harms that Beard alleges are not a "concrete injury" sufficient to support Article III standing, and even if ringless voicemails are calls and Beard has standing, Beard provided prior express written consent to be contacted. See id.

II.

Summary judgment is appropriate when, after reviewing the record as a whole, the court

3

determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a); Scott v. Harris, 550 U.S. 372, 378, 380 (2007); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The party seeking summary judgment must initially demonstrate the absence of a genuine issue of material fact or the absence of evidence to support the nonmoving party's case. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, see Anderson, 477 U.S. at 248–49, but "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis and quotation omitted). A trial court reviewing a motion for summary judgment should determine whether a genuine issue of material fact exists for trial. See Anderson, 477 U.S. at 249. In making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. See Harris, 550 U.S. at 378.

A genuine issue of material fact exists if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. See Anderson, 477 U.S. at 249. "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position [is] insufficient . . . ." Id. at 252; see Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) ("The nonmoving party, however, cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."). Only factual disputes that affect the outcome under substantive law properly preclude summary judgment. See Anderson, 477 U.S. at 248.

### A.

JH Chevrolet argues that the prerecorded ringless voicemails left for Beard several times are not "calls" under the TCPA. The TCPA makes it unlawful "to make any call . . . using any

4

automatic telephone dialing system or an artificial or prerecorded voice . . . to any telephone number assigned to a . . . cellular telephone service." 47 U.S.C. § 227(b)(1)(A). The TCPA does not define "call" and the FCC, United States Supreme Court, and Fourth Circuit have not decided whether a ringless voicemail qualifies as a call.

Although only a few courts have addressed whether a ringless voicemail is a call under the TCPA, every court that has addressed this question has held that a ringless voicemail is a call under the TCPA. See, e.g., Grigorian v. FCA US, LLC, 838 F. App'x 390, 393 (11th Cir. 2020) (unpublished) (per curiam); Schaevitz v. Braman Hyundai, Inc., 437 F. Supp. 3d 1237, 1246–49 (S.D. Fla. 2019); Saunders v. Dyck O'Neal, 319 F. Supp. 3d 907, 909–12 (W.D. Mich. 2018). Moreover, other courts have held that "call" as used in the TCPA means "to communicate with or try to get into communication with a person by a telephone." See, e.g., Ashland Hosp. Corp. v. Serv. Employees Int'l Union Dist. 119 WV/KY/OH, 708 F.3d 737, 742 (6th Cir. 2013). And a ringless voicemail does just that. Furthermore, prerecorded voicemails, text messages, and calls that directly go to voicemail are subject to the same TCPA restrictions as traditional calls. See, e.g., Gadelhak v. AT&T Servs., Inc., 950 F.3d 458, 461–63 (7th Cir. 2020) (Barrett, J.); see also 47 U.S.C. § 227(b)(1)(A)(iii); Melito v. Experian Mktg. Sols., Inc., 923 F.3d 85, 92–95 (2d Cir. 2019); Van Patten v. Vertical Fitness Group, LLC, 847 F.3d 1037, 1043 (9th Cir. 2017); Susinno v. Work Out World, Inc., 862 F.3d 346, 350–52 (3d Cir. 2017); Soppet v. Enhanced Recovery Co., LLC, 679 F.3d 637, 638 (7th Cir. 2012); Davis v. Safe Street USA, LLC, 497 F. Supp. 3d 47, 54 (E.D.N.C. 2020). And the FCC proposed a ruling earlier this year declaring ringless voicemails subject to TCPA prohibition. See Rosenworcel Proposes 'Ringless Voicemail' Robocall Protections, FCC (Feb. 2, 2022), https://www.fcc.gov/document/rosenworcel- proposes-ringless-voicemail-robocall-protections.

5

In response, JH Chevrolet argues that the Supreme Court rejected the attempt to "graft old TCPA law onto new technology" in Facebook, Inc. v. Duguid, 141 S. Ct. 1163 (2021). See [D.E. 33] 12. However, in Facebook, the Court analyzed whether Facebook's technology qualified as an "automatic telephone dialing system" ("ATDS") under the TCPA, not whether text messages sent using such technology constituted a call. See Facebook, 141 S. Ct. at 1168–71; see also 47 U.S.C. § 227(a)(1)). In Facebook, the Court held that the technology Facebook used was not an ATDS. See Facebook, 141 S. Ct. at 1170.

Facebook does not help JH Chevrolet. First, Beard does not contend that JH Chevrolet used an ATDS, and this action does not involve a dispute about using an ATDS. See [D.E. 59] 10. Second, in Facebook, the Court did not address ringless voicemail messages like the disputed calls in this action. Cf. Facebook, 141 S. Ct. at 1169–73. Third, voicemail technology existed when Congress enacted the TCPA. Considering the text of the TCPA, the plain meaning of the word "call," and other courts' conclusion that a ringless voicemail is a "call" under the TCPA, the court holds that a ringless voicemail is a "call" under the TCPA.

B.

JH Chevrolet argues that Beard does not have standing. In order to have standing, a plaintiff must show: (1) that the plaintiff has "'suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical'"; (2) "'a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not . . . the result of the independent action of some third party not before the court'"; and (3) that it is "'likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision'" from the court. Chambers Med. Techs. of S.C., Inc. v. Bryant, 52 F.3d 1252, 1265 (4th Cir. 1995) (cleaned

6

up) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992)); see TransUnion, LLC v. Ramirez, 141 S. Ct. 2190, 2203 (2021); Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016). These requirements are "the irreducible constitutional minimum of standing." Lujan, 504 U.S. at 560; see Spokeo, Inc., 136 S. Ct. at 1547. If a plaintiff does not have standing, the court does not have subject-matter jurisdiction to hear the plaintiff's claims. See, e.g., Lujan, 504 U.S. at 560–61; White Tail Park, Inc. v. Stroube, 413 F.3d 451, 459 (4th Cir. 2005); Payne v. Sears, Roebuck & Co., No. 5:11-CV-614-D, 2012 WL 1965389, at *3 (E.D.N.C. May 31, 2012) (unpublished).

JH Chevrolet argues that the intangible harms that Beard alleges are not a "concrete injury" sufficient to support Article III standing. See TransUnion, 141 S. Ct. at 2205. In support, JH Chevrolet argues that TransUnion expanded Spokeo by holding that "under Article III, an injury in law is not an injury in fact" and a plaintiff must suffer more than conduct that violates a statute. Id. Before TransUnion, however, the Court had held that "a mere statutory violation is not synonymous with Article III standing[,]" and TransUnion did not expand this principle, but rather explained and reaffirmed Spokeo. TransUnion, 141 S. Ct. at 2202–07; see Frank v. Gaos, 139 S. Ct. 1041, 1046 (2019); Spokeo, 136 S. Ct. at 1549; Garey v. James S. Farrin, P.C., 35 F.4th 917, 921–22 (4th Cir. 2022); Krakauer v. Dish Network, LLC, 925 F.3d 643, 652 (4th Cir. 2019).

In TransUnion, the Court reaffirmed the history and tradition test from Spokeo for determining when a harm is concrete, holding that "courts should assess whether the alleged injury to the plaintiff has a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts." TransUnion, 141 S. Ct. at 2204; Spokeo, 136 S. Ct. at 1540. The "close relationship" inquiry focuses "on types of harms protected at common law, not the precise point at which those harms become actionable." Krakauer, 925 F.3d at 654. In other words, a plaintiff does not have to allege a harm "that would support a common law cause of action," but

7

rather must identify a historic corollary of the kind of harm that she suffers. Id. at 653–54. "Congress may elevate to the status of legally cognizable injuries concrete, de facto injuries that were previously inadequate at law." Spokeo, 136 S. Ct. at 1549 (quotation and alteration omitted); see Lujan, 504 U.S. at 578, 112 S. Ct. 2130; Krakauer, 925 F.3d at 654. Moreover, this close relationship "does not require an exact duplicate in American history and tradition." TransUnion, 141 S. Ct. at 2204.

A defendant can mount either a facial or a factual attack upon standing. See Hutton v. Nat'l Bd. of Exam'rs in Optometry, Inc., 892 F.3d 613, 620–21 (4th Cir. 2018); Kerns v. United States, 585 F.3d 187, 192 (4th Cir. 2009); Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982). A facial attack asserts that a complaint fails to allege facts supporting subject-matter jurisdiction. See Hutton, 892 F.3d at 621 n.7; Adams, 697 F.2d at 1219. When a defendant makes a facial challenge to subject-matter jurisdiction, the court accepts the factual allegations of the complaint as true. See Beck v. McDonald, 848 F.3d 262, 270 (4th Cir. 2017); Kerns, 585 F.3d at 192; Adams, 697 F.2d at 1219.

In evaluating a class action complaint, the court analyzes "standing based on the allegations of personal injury made by the named plaintiffs." Hutton, 892 F.3d at 620 (quotation omitted); see Beck, 848 F.3d at 269; Doe v. Obama, 631 F.3d 157, 160–61 (4th Cir. 2011). Thus, if Beard lacks standing, this court lacks subject-matter jurisdiction.

JH Chevrolet facially attacks Beard's standing and argues that Beard did not allege a concrete injury. The Fourth Circuit has not addressed whether a few ringless voicemails suffice to support standing. Some courts have held a single text message suffices to support standing to bring a TCPA claim. See Gadelhak, 950 F.3d at 461–63; Melito, 923 F.3d at 92–95; Van Patten, 847 F.3d at 1043; cf. Susinno, 862 F.3d at 350–52 (discussing Spokeo and holding that an unsolicited call to plaintiff's

8

cell phone constitutes a concrete injury for a TCPA claim); but see Salcedo v. Hanna, 936 F.3d 1162, 1165 (11th Cir. 2019).

The Gadelhak court's reasoning and the prevailing view among the circuits comport with the Fourth Circuit's analysis in Krakauer and the Supreme Court's decision in TransUnion. In Krakauer, the Fourth Circuit rejected the notion that a plaintiff must, in effect, plead a common law cause of action to establish concrete injury. See Krakauer, 925 F.3d at 653–54. Rather, the Krakauer court focused on the kinds of harms common law causes of action addressed in light of plaintiff's alleged harm. See id.; see also Melito, 923 F.3d at 92–95; Van Patten, 847 F.3d at 1043; cf. Susinno, 862 F.3d at 350–52. Moreover, the Krakauer court cited Van Patten approvingly when discussing harms—specifically, intrusions upon seclusion—sufficient to confer standing to bring a TCPA claim. See Krakauer, 925 F.3d at 653. And statutory injury to support standing "does not require an exact duplicate in American history and tradition." TransUnion, 141 S. Ct. at 2204.

Few courts have addressed whether a ringless voicemail is similar to a text message and can support standing. Although the Eleventh Circuit and Northern District of Ohio recently held that a single ringless voicemail did not suffice to support standing, those courts relied on Salcedo's reasoning. See Grigorian, 838 F. App'x at 393; Dickson v. Direct Energy, LP, No. 5:18CV182, 2022 WL 889207, at *1–3 (N.D. Ohio Mar. 25, 2022) (unpublished). This court, however, rejected Salcedo's approach, holding that Fourth Circuit precedent aligns more closely with the Seventh Circuit in Gadelhak. See Davis, 497 F. Supp. 3d at 54; see also Gadelhak, 950 F.3d at 461–63; Krakauer, 925 F.3d at 653–54. Therefore, this court concludes that receiving a ringless voicemail supports standing under Article III for a TCPA claim so long as there is a connection to a traditional common law injury.

As for Beard's allegations, Beard has plausibly alleged "concrete injury" to support Article

9

III standing. Beard alleges that the ringless voicemails caused "invasion of privacy, aggravation, annoyance, intrusion on seclusion, trespass, and conversion," all traditional common law injuries. See Am. Compl. ¶¶ 22–35. Beard alleges that she had to "stop what she was doing and listen to the pre-recorded messages" and that JH Chevrolet's "calls occupied [her] telephone lines and rendered the devices unavailable for the receipt of other calls." Id. at ¶¶ 22–23. The court views these factual allegations in the light most favorable to Beard. See Beck, 848 F.3d at 270. Moreover, the harm Beard alleges bears a close relationship to the common law tort of inclusion upon seclusion. See Gadelhak, 950 F.3d at 462–63; Van Patten, 847 F.3d at 1041–43; Melito, 923 F.3d at 92–94; cf. Krakauer, 925 F.3d at 653–54; Susinno, 862 F.3d at 350–52. And it is a harm Congress sought to remedy in the TCPA. See Krakauer, 925 F.3d at 653–54; see also Gadelhak, 950 F.3d at 462–63; cf. Campbell-Ewald Co. V. Gomez, 136 S. Ct. 663, 667 (2016). Accordingly, Beard has standing under Article III to pursue her TCPA claim.

C.

As a defense to a potential TCPA violation, JH Chevrolet argues that Beard provided prior express written consent to contact her. The TCPA makes it unlawful for any person:

> to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system [("ATDS")] or an artificial or prerecorded voice . . . (iii) to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call, unless such call is made solely to collect a debt owed to or guaranteed by the United States . . . .

47 U.S.C. § 227(b)(1)(A); see Mims v. Arrow Fin. Servs., LLC, 565 U.S. 368, 373 (2012); Cunningham v. Gen. Dynamics Info. Tech., Inc., 888 F.3d 640, 644–45 (4th Cir. 2018); Galbreath v. Time Warner Cable, Inc., No. 7:14-CV-61, 2015 WL 9450593, at *2 (E.D.N.C. Dec. 22, 2015) (unpublished). Thus, the TCPA excludes those calls made with "prior express consent of the called

10

party." 47 U.S.C. § 227(b)(1)(a)(iii). "Prior express consent is an affirmative defense to liability under the TCPA." Cartrette v. Time Warner Cable, Inc., 157 F. Supp. 3d 448, 452 (E.D.N.C. 2016); Snow v. Glob. Credit & Collection Corp., No. 5:13-CV-721, 2014 WL 5781439, at *5 (E.D.N.C. Nov. 6, 2014) (unpublished); see Van Patten, 847 F.3d at 1044 (collecting cases).

As for the meaning of prior express consent, the FCC issued a Declaratory Ruling and Order, clarifying that the content of the call determines the type of consent required. See In the Matter of Rules & Regs. Implementing the Telephone Consumer Protection Act of 1991, Declaratory Ruling, 30 FCC Rcd. 7961, 7968 ¶ 4, 2015 WL 4387780, at *4 ¶ 4 (July 1, 2015). If the call includes or introduces an advertisement or constitutes telemarketing, consent must be in writing. See 47 C.F.R. § 64.1200(b)(3); see also Van Patten, 847 F.3d at 1045. The parties do not dispute that JH Chevrolet's prerecorded messages were "telemarketing." See [D.E. 33] 7. Thus, JH Chevrolet must demonstrate prior express written consent.

"Prior express written consent means an agreement, in writing, bearing the signature of the person called that clearly authorizes the seller to deliver or cause to be delivered to the person called advertisements or telemarketing messages using an automatic telephone dialing system or an artificial or prerecorded voice, and the telephone number to which the signatory authorizes such advertisements or telemarketing messages to be delivered." 47 C.F.R. § 64.1200(f)(9) (emphasis added). In addition, that written consent agreement must "include a clear and conspicuous disclosure informing the person signing that . . . [they] authorize[] the seller to deliver . . . telemarketing calls using an automatic telephone dialing system or an artificial or prerecorded voice." Id. Clear and conspicuous "means a notice that would be apparent to the reasonable consumer, separate and distinguishable from the advertising copy or other disclosures." Id. § 64.1200(f)(3). Finally, even with express written consent, such calls must "provide an automated, interactive voice- and/or key

11

pressactivated opt-out mechanism for the called person to make a do-not-call request, including brief explanatory instructions on how to use such mechanism." Id. § 64.1200(b)(3).

JH Chevrolet did not raise the affirmative defense of prior express consent in its answer. See [D.E. 13]; cf. Fed. R. Civ. Pro. 8(c). "Although it is indisputably the general rule that a party's failure to raise an affirmative defense in the appropriate pleading results in waiver, see 5 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1278 (1990), absent unfair surprise or prejudice to the plaintiff, a defendant's affirmative defense is not waived when it is first raised in a pre-trial dispositive motion[.]" Brinkley v. Harbour Recreation Club, 180 F.3d 598, 612 (4th Cir.1999) (collecting cases), overruled on other grounds by Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003). By raising the prior express consent defense in its motion for summary judgment, JH Chevrolet did not unfairly surprise or prejudice Beard. Beard addressed the issue of prior express consent in her initial complaint [D.E. 1] and amended complaint. See Am. Compl. ¶ 33. Moreover, Beard does not allege unfair surprise or any such prejudice. Therefore, the court analyzes whether JH Chevrolet has demonstrated that Beard provided prior express written consent.

JH Chevrolet argues in its motion for summary judgment that Beard provided prior express written consent to contact her via telephone. See [D.E. 33] 6–12. Beard disagrees, arguing that JH Chevrolet did not provide required disclosures. See [D.E. 59] 17–21. According to Beard, she input her personal information on WeBuy's website, provided her phone number, and consented to contact via a live caller, email, and mail. See [D.E. 60] ¶¶ 6–7. Beard does not recall whether she actually clicked on the "I agree to" box on WeBuy's website. See [D.E. 60] ¶ 13. Nonetheless, JH Chevrolet's exhibits and the fact that Beard could not have proceeded in the process without clicking the "I agree to" box and proceeding to the next page demonstrate that Beard clicked the "I agree to" box. Compare [D.E. 33] 7–11 and [D.E. 33-1] 53–55 and [D.E. 62] 3–5 with [D.E. 60] ¶¶ 7–13, 15;

12

see also Ennis v. National Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d 55, 62 (4th Cir. 1995) ("[m]ere unsupported speculation . . . is not enough to defeat a summary judgment motion."); Beale, 769 F.2d at 214 (A litigant "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another.").

As for whether the hyperlinked documents satisfy disclosure requirements, the Fourth Circuit has not addressed the issue of consent with certain online disclosures such as the one here. Other courts have held that when disclosures such as terms of service or privacy agreements are clearly shown and not hidden at the bottom of the page or in fine print, despite having the disclosures linked, those prominent links to terms and agreement satisfy disclosure requirements. See Regan v. Pinger, Inc., No. 20-CV-02221, 2021 WL 706465, at *6 (N.D. Ca. Feb. 23, 2021) (unpublished) (collecting cases); Lundbom v. Schwan's Home Service, Inc., No. 3:18-cv-02187, 2020 WL 2736419, at * 7–9 (D. Or. May 26, 2020) (unpublished); Sullivan v. All Web Leads, Inc., No. 17 C 1307, 2017 WL 2378079, at *6–8 (N.D. Ill. June 1, 2017) (unpublished) (collecting cases).

The disclosure here is a clickwrap agreement.[1] See [D.E. 33-1] 54. WeBuy's webpage

---

[1] The Eastern District of Virginia recently discussed different types of online adhesion contracts, such as the clickwrap contract:

There are many types of online adhesion contracts, including browsewrap, clickwrap and sign-in-wrap. A browsewrap agreement does not require a user to click "I agree" to use the web services, but rather attempts to bind the user to hyperlinked terms simply through using the website. A "clickwrap" agreement is one in which a user accepts a website's terms of use by clicking an "I agree" or "I accept" box, with a link to the agreement readily available. Finally, sign-in-wrap agreements occur when a prospective user signs up for a product or service and the screen states that the acceptance of the terms and conditions are required to access the product or service. While the user has access to the terms and conditions via a hyperlink, the user does not have to read the terms and conditions before signing up. Courts generally have looked more favorably upon clickwrap and sign-in-wrap agreements than browsewrap agreements. The contract at issue here most closely resembles a sign-in-wrap agreement. However, as the District of Columbia District Court

13

prominently displayed the "I agree to" box on the same page as the clickwrap agreements with easily accessible links to the disclosures. Id.; [D.E. 60] ¶¶ 9–12. The words "Terms of Service," "Privacy Policy," and "Privacy Notice" appeared in a light red color—to indicate hyperlinking—while the other words in the statement appeared black. See [D.E. 33-1] 54. The acceptance statement appeared in the same size and style font as the prompts used to direct a user to enter his name, email address and password. See id. And an individual had to check the box before she could proceed to the next page. See [D.E. 33-1] 54–55. The hyperlinked agreements contained passages notifying Beard that her information could be used "for our marketing purposes" and "for our affiliates to market to you." [D.E. 35] 74–75. Accordingly, because Beard clicked the "I agree to" box and the hyperlinks provided sufficient disclosure, the court concludes that Beard provided prior express written consent.

Although the TCPA does not contain a revocation of consent provision and the Fourth Circuit has not expressly addressed the issue, courts have interpreted the common law consent and revocation doctrine to apply to the TCPA. Schweitzer v. Comenity Bank, 866 F.3d 1273, 1276–79 (11th Cir. 2017); Gager v. Dell Fin. Sers., LLC, 727 F.3d 265, 270–72 (3d Cir. 2013); Galbreath, 2015 WL 9450593, at *4–5; cf. Neder v. United States, 527 U.S. 1, 21–22 (1999) ("[W]here Congress uses terms that have accumulated settled meaning under . . . the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms."). Where a customer has arguably revoked consent but the record is unclear whether consent was revoked as to all accounts or only partially revoked, then a genuine issue of

---

properly noted, "while the relevant terminology continues to evolve, the Court's inquiry into contract formation does not."

Melo v. Zumper, Inc., 439 F. Supp. 3d 683, 696 n.8 (E.D. Va. Jan. 28, 2020) (cleaned up).

14

material fact exists concerning revocation of consent. See Osorio v. State Farm Bank, F.S.B., 746 F.3d 1242, 1256 (11th Cir. 2014); Ammons v. Ally Fin., Inc., 326 F. Supp. 3d 578, 600–01 (M.D. Tenn. 2018) (collecting cases); Zondlo v. Allied Interstate, LLC, 290 F. Supp. 3d 296, 304–05 (M.D. Pa. 2018); Patterson v. Ally Fin., Inc., No. 3:16-cv-1592-J-32, 2018 WL 647438, at *6 (M.D. Fla. Jan. 31, 2018) (unpublished); Jara v. GC Servs. Ltd. P'ship, No. 2:17-cv-04598, 2018 WL 2276635, at *3–4 (C.D. Ca. May 17, 2018) (unpublished); Herrera v. First Nat'l Bank of Omaha, Neb., No. 2:17-cv-01136, 2017 WL 6001718, at *3–4 (C.D. Ca. Dec. 4, 2017) (unpublished).

The parties agree that, if there was prior express written consent, Beard revoked consent to contact for the 0677 number. See [D.E. 60] ¶¶ 20–24. Beard does not argue, however, that when she revoked consent on the 0677 number she also revoked consent on the 6590 number. See id. After Beard left a voicemail for JH Chevrolet asking not to be contacted on her 0677 number, JH Chevrolet did not leave any other voicemails on the 0677 number. See [D.E. 60] ¶¶ 20–24. Moreover, the record demonstrates that Beard provided prior express written consent concerning the 6590 number and that JH Chevrolet acted consistently with Beard's prior express written consent. Accordingly, the court grants JH Chevrolet's motion for summary judgment.

III.

In sum, the court GRANTS defendant's motion for summary judgment [D.E. 32] and DISMISSES the action. Defendant may file a motion for costs in accordance with the Federal Rules of Civil Procedure and this court's local rules. The clerk shall close the case.

SO ORDERED. This 9 day of November, 2022.

JAMES C. DEVER III
United States District Judge

15